Oscar Rey Rodriguez
State Bar No. 00791557
Fee, Smith & Sharp LLP
13155 Noel Rd, Ste 1000
Dallas, Texas 75240
Telephone: (972) 934-9100
Facsimile: (972) 934-9200
ATTORNEY FOR DEBTOR

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **2999TC ACQUISITIONS, LLC,** | § | **CASE NO. 21-31954-hdh11** |
| | § | |
| **DEBTOR.** | § | **CHAPTER 11** |

**DEBTOR'S TRIAL BRIEF REGARDING HNGH'S LEGAL NULLITY "DOCUMENT SPEAKS FOR ITSELF" OBJECTIONS**

COMES NOW 2999TC Acquisitions, LLC, Debtor in the above styled and numbered case ("Debtor"), and files this Debtor's Trial Brief Regarding HNGH's Legal Nullity "Document Speaks for Itself" Objections, and in support would show the Court the following:

1. The Debtor respectfully refers the Court to the attached Fifth Circuit Opinion of *United States v. Nelson*, 732 F.3d 504 (5th Cir. 2013) speaking directly to the legal non-viability of "the document speaks for itself" objections in the context of examining witnesses with personal knowledge or special expertise as follows:

> [T]he opinion testimony of a witness with personal or expert knowledge, helpful and pertaining to a document, is not objectionable on the ground that the document "speaks for itself." Properly made, such an objection may pertain to the character and scope of testimony under Rules 403 and 611. The original writings rule, Rule 1002, however, should not be misunderstood as a "best evidence" device to exclude otherwise admissible opinion testimony interpreting a writing after it has been introduced into evidence.

*United States v. Nelson*, 732 F.3d 504, 518 n.4 (5th Cir. 2013) (internal citations omitted); *See* Fed. R. Evid. 701, 702 (attached hereto as Exhibit "A").

2. Throughout this hearing, the Court has sustained numerous objections under the claim of "the document speaks for itself."

3. Under Federal Rules of Evidence 701, 702, and 1002, these objections are not valid and should not be considered grounds for objections within these proceedings.

WHEREFORE, PREMISES CONSIDERED, the Debtor requests this Court overrule all of sustained objections on the basis of "the document speaks for itself" during the pendency of the Motion to Enforce Agreed Orders hearings and permit Debtor to re-examine all witnesses and documents where the Court sustained John Kane Esq.'s "the document speaks for itself" type objections, and for such other relief as may be just.

Dated: July 7, 2022.

Respectfully submitted,

*/s/ Oscar Rey Rodriguez*

Oscar Rey Rodriguez
State Bar No. 00791557
Fee, Smith & Sharp LLP
13155 Noel Rd, Ste 1000
Dallas, Texas 75240
Telephone: (972) 934-9100
Facsimile: (972) 934-9200
rrodriguez@feesmith.com
ATTORNEY FOR DEBTOR

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 7, 2022, a true and correct copy of the foregoing document was served via email pursuant to the Court's ECF system upon the parties receiving electronic notice in this case listed below.

Jeffery D. Carruth
jcarruth@wkpz.com,
jcarruth@aol.com;atty_carruth@trustesolutions.com;carruthjr87698@notify.bestcase.com

Katherine T. Hopkins
katherine.thomas@kellyhart.com

John J. Kane
jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com

Sherrel K. Knighton
Sherrel.Knighton@lgbs.com, Dora.Casiano-Perez@lgbs.com;Sean.French@lgbs.com;Dallas.Bankruptcy@lgbs.com

Joyce W. Lindauer
joyce@joycelindauer.com, dian@joycelindauer.com;12113@notices.nextchapterbk.com

Steven C. Metzger
smetzger@pmklaw.com

Russell Hale Neilson
hneilson@parkinslee.com, hneilson@ecf.courtdrive.com

Robin Eric Phelan
robin@phelanlaw.org

United States Trustee
ustpregion06.da.ecf@usdoj.gov

Kyle Woodard
kwoodard@krcl.com, KWoodard@ecf.courtdrive.com

*/s/ Oscar Rey Rodriguez*
Oscar Rey Rodriguez

Caution
As of: July 6, 2022 10:14 PM Z

**EXHIBIT "A"**

# United States v. Nelson

United States Court of Appeals for the Fifth Circuit

October 14, 2013, Filed

No. 12-30101

**Reporter**

732 F.3d 504 *; 2013 U.S. App. LEXIS 20752 **; 2013 WL 5612057

UNITED STATES OF AMERICA, Plaintiff - Appellee v. THOMAS A. NELSON, JR., Defendant - Appellant

**Subsequent History:** Appeal dismissed by, As moot United States v. Nelson, 550 Fed. Appx. 239, 2013 U.S. App. LEXIS 25816 (5th Cir. La., Dec. 30, 2013)

US Supreme Court certiorari denied by *Nelson v. United States, 572 U.S. 1143, 134 S. Ct. 2682, 189 L. Ed. 2d 224, 2014 U.S. LEXIS 3788 (May 27, 2014)*

Decision reached on appeal by United States v. Nelson, 631 Fed. Appx. 237, 2016 U.S. App. LEXIS 1099 (5th Cir. La., Jan. 22, 2016)

Certificate of appealability denied United States v. Nelson, 2019 U.S. Dist. LEXIS 62434 (M.D. La., Apr. 10, 2019)

**Prior History:** [**1] Appeal from the United States District Court for the Middle District of Louisiana.

United States v. Grace, 2012 U.S. Dist. LEXIS 515 (M.D. La., Jan. 4, 2012)

## Case Summary

### Overview

HOLDINGS: [1]-The district court properly denied defendant, who was convicted of bribery under 18 U.S.C.S. § 666(a)(1)(B), an entrapment jury instruction because he made no plausible showing of lack of disposition since he was an active, enthusiastic participant in the crime; [2]-Statements were properly admitted under the co-conspirator hearsay exclusion under Fed. R. Evid. 801(d)(2)(E); [3]-The district court miscalculated the value of defendant's bribery activity under U.S. Sentencing Guidelines Manual §§ 2B1.1 and 2C1.1 as to an EPA letter to help assist a company to obtain a grant because the amount of loss could not reasonably be determined since there was insufficient evidence to adequately differentiate between legitimate funding the company could have received and any benefits that defendant intended to stem from the letter.

### Outcome

Conviction affirmed, sentence vacated, and case remanded for resentencing.

## LexisNexis® Headnotes

Criminal Law & Procedure > Defenses > Burdens of Proof

Criminal Law & Procedure > Defenses > Entrapment

Criminal Law & Procedure > ... > Jury Instructions > Particular Instructions > Theory of Defense

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > Jury Instructions

HN1[] **Defenses, Burdens of Proof**

An appellate court reviews a district court's decision not to grant an entrapment instruction de novo, looking at the evidence in the light most favorable to the defendant. Entrapment is an affirmative defense that operates through a burden shifting regime. Generally, entrapment is a question for the jury, not for the court. But in order for an entrapment instruction to be put to the jury, a defendant must make a prima facie showing of two elements: (1) lack of predisposition to commit the offense and (2) some governmental involvement and inducement more substantial than simply providing an

opportunity or facilities to commit the offense. Both elements pose the same ultimate question: whether criminal intent originated with the defendant or with government agents.

Criminal Law & Procedure > Defenses > Entrapment

*HN2*[] **Defenses, Entrapment**

The principal element in the defense of entrapment is predisposition. To determine whether the defendant lacked predisposition, a court considers whether he intended, was predisposed, or was willing to commit the offense before first being approached by government agents. A defendant lacks predisposition where he had no prior interest or experience related to the crime, displayed significant hesitation or unwillingness, or attempted to return discussion to lawful conduct. By contrast, if the evidence suggests that the defendant was an unwary criminal who readily availed himself of the opportunity to perpetrate the crime, then predisposition is present. Evidence to show predisposition may include active, enthusiastic participation or demonstrated expertise in the criminal endeavor. If a defendant displays such expertise or enthusiasm yet fails to show any hint of hesitation or unwillingness, a court will find predisposition.

Criminal Law & Procedure > Defenses > Entrapment

*HN3*[] **Defenses, Entrapment**

Independently motivated behavior that occurs after government solicitation begins may constitute evidence of predisposition.

Criminal Law & Procedure > Defenses > Entrapment

*HN4*[] **Defenses, Entrapment**

A defendant's ready and willing participation in government-solicited criminal activity, standing alone, is sufficient to prove predisposition.

Criminal Law & Procedure > Defenses > Entrapment

*HN5*[] **Defenses, Entrapment**

Many factors indicate a defendant's predisposition, including a showing of defendant's desire for profit, his eagerness to participate in the transaction, his ready response to the government's inducement offer, or his demonstrated knowledge or experience in the criminal activity under investigation.

Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > Evidence

Evidence > ... > Exemptions > Statements by Coconspirators > Members of Conspiracy

Evidence > ... > Exemptions > Statements by Coconspirators > Statements During Conspiracy

Evidence > ... > Exemptions > Statements by Coconspirators > Statements Furthering Conspiracy

*HN6*[] **Abuse of Discretion, Evidence**

Under *Fed. R. Evid. 801(d)(2)(E)*, an opposing party's statement is not considered hearsay if it was made by the party's coconspirator during and in furtherance of the conspiracy. An appellate court will review the admission of hearsay evidence under the non-hearsay definition of *Rule 801(d)(2)(E)* for abuse of discretion. To establish a foundation for admission of evidence under this exclusion, the government must show (1) the existence of a conspiracy, (2) that the statement was made by a co-conspirator of a party, (3) the statement was made during the course of the conspiracy, and (4) the statement was made in furtherance of the conspiracy. The statement itself must be considered but cannot by itself establish the existence of the conspiracy or participation in it. *Rule 801(d)(2)*. There must be independent evidence establishing the conspiracy.

Evidence > ... > Exemptions > Statements by Coconspirators > Statements During Conspiracy

Evidence > ... > Exemptions > Statements by Coconspirators > Statements Furthering Conspiracy

*HN7*[] **Statements by Coconspirators, Statements**

**During Conspiracy**

A conspiracy for the purpose of the hearsay exclusion need not be unlawful; the statement may be made in furtherance of a lawful joint undertaking. A conspiracy may be shown merely by engaging in a joint plan that was non-criminal in nature. Thus, a statement is not hearsay if it was made during the course and in furtherance of a common plan or endeavor with a party.

Criminal Law & Procedure > ... > Entry of Pleas > Guilty Pleas > Admissibility at Trial

Evidence > Admissibility > Statements as Evidence > Pleas & Related Statements

Criminal Law & Procedure > ... > Entry of Pleas > Guilty Pleas > Changes & Withdrawals

**HN8[] Guilty Pleas, Admissibility at Trial**

Fed. R. Evid. 410 prohibits the use of a guilty plea that was later withdrawn or a statement made during a proceeding on that plea under Fed. R. Crim. P. 11.

Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > Evidence

Evidence > Admissibility > Statements as Evidence > Pleas & Related Statements

Criminal Law & Procedure > ... > Entry of Pleas > Guilty Pleas > Knowing & Intelligent Requirement

Criminal Law & Procedure > ... > Entry of Pleas > Guilty Pleas > Voluntariness

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > General Overview

**HN9[] Abuse of Discretion, Evidence**

A district court's admission of evidence, if objected to, is reviewed for abuse of discretion. De novo review of attendant legal issues is a component part of that abuse of discretion review. Absent some affirmative indication that an agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea-statement rules is valid and enforceable. The government is allowed to use the defendant's statements, made during plea negotiations, in its case-in-chief provided that the defendant, as a condition to engaging in negotiations with the government, knowingly and voluntarily waived all rights to object to such use.

Constitutional Law > ... > Fundamental Rights > Criminal Process > Assistance of Counsel

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > Conclusions of Law

Evidence > Privileges > Attorney-Client Privilege > Elements

Criminal Law & Procedure > ... > Standards of Review > Clearly Erroneous Review > Findings of Fact

Evidence > Privileges > Attorney-Client Privilege > Scope

**HN10[] Criminal Process, Assistance of Counsel**

The application of the attorney-client privilege is a question of fact, to be determined in the light of the purpose of the privilege and guided by judicial precedents. The clearly erroneous standard of review applies to the district court's factual findings. An appellate court reviews the application of the controlling law de novo. To assert the privilege, a party must show: (1) a confidential communication; (2) to a lawyer or subordinate; (3) for the primary purpose of securing a legal opinion, legal services, or assistance in the legal proceeding. The privilege does not protect everything that arises out of the existence of an attorney-client relationship. An attorney-client communication is also protected under the Sixth Amendment if it is intended to remain confidential and was made under such circumstances that it was reasonably expected and understood to be confidential.

Evidence > Relevance > Exclusion of Relevant Evidence > Confusion, Prejudice & Waste of Time

Evidence > Types of Evidence > Documentary Evidence > Best Evidence Rule

Evidence > Admissibility > Expert

Witnesses > Helpfulness

Evidence > ... > Lay Witnesses > Opinion Testimony > Helpfulness

**HN11[] Exclusion of Relevant Evidence, Confusion, Prejudice & Waste of Time**

The opinion testimony of a witness with personal or expert knowledge, helpful and pertaining to a document, is not objectionable on the ground that the document speaks for itself. *Fed. R. Evid. 701*, *702*. Properly made, such an objection may pertain to the character and scope of testimony under *Fed. R. Evid. 403* and *611*. The original writings rule, *Fed. R. Evid. 1002*, however, should not be misunderstood as a best evidence device to exclude otherwise admissible opinion testimony interpreting a writing after it has been introduced into evidence.

Criminal Law & Procedure > Preliminary Proceedings > Pretrial Motions & Procedures > Competency to Stand Trial

Evidence > Privileges > Attorney-Client Privilege > Exceptions

Evidence > Privileges > Attorney-Client Privilege > Scope

**HN12[] Pretrial Motions & Procedures, Competency to Stand Trial**

The mere appearance of an attorney testifying against a former client is distasteful and should only be used in rare instances. The U.S. Court of Appeals for the Fifth Circuit has, nonetheless, allowed attorneys, in narrow circumstances, to testify about their former clients' mental competence. An attorney's evaluation of his client's mental competency during plea bargaining does not constitute private, confidential communications because the attorney is as qualified as a layman to express a view as to his client's mental competency. Excluded from the privilege are the physical characteristics of the client, such as his demeanor, his bearing, and his sobriety. Such things are observable by anyone who talked with the client.

Evidence > ... > Procedural Matters > Preliminary Questions > Existence of Privileges

Evidence > ... > Procedural Matters > Preliminary Questions > Witness Qualifications

**HN13[] Preliminary Questions, Existence of Privileges**

See *Fed. R. Evid. 104(a)*.

Evidence > ... > Procedural Matters > Preliminary Questions > Hearings Out of Jury's Presence

**HN14[] Preliminary Questions, Hearings Out of Jury's Presence**

See *Fed. R. Evid. 104(c)*.

Criminal Law & Procedure > ... > Standards of Review > Harmless & Invited Error > Evidence

**HN15[] Harmless & Invited Error, Evidence**

Where objected to testimony is cumulative of other testimony that has not been objected to, the error that occurred is harmless.

Criminal Law & Procedure > ... > Appeals > Standards of Review > Clear Error Review

Criminal Law & Procedure > ... > Appeals > Standards of Review > De Novo Review

Criminal Law & Procedure > Sentencing > Sentencing Guidelines > General Overview

**HN16[] Standards of Review, Clear Error Review**

Although an appellate court reviews a district court's loss calculations for clear error, it reviews the district court's method of determining the amount of loss, as well as its interpretations of the meaning of a sentencing guideline, de novo.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments &

Enhancements > General Overview

Criminal Law & Procedure > ... > Bribery > Public Officials > Penalties

**HN17[] Sentencing Guidelines, Adjustments & Enhancements**

The sentencing guidelines provide that the offense level for bribery-related offenses is to be increased as follows: If the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $5,000, increase by the number of levels from the table in *U.S. Sentencing Guidelines Manual § 2B1.1* corresponding to that amount. *U.S. Sentencing Guidelines Manual § 2C1.1(b)(2)*. The application notes to *§ 2B1.1* state that for the purpose of this calculation, loss is the greater of actual loss or intended loss. *§ 2B1.1*, cmt., application n. 3(A). Intended loss means the pecuniary harm that was intended to result from the offense and includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value). *§ 2B1.1*, cmt., application n. 3(A)(ii).

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

Evidence > Burdens of Proof > Preponderance of Evidence

**HN18[] Sentencing Guidelines, Adjustments & Enhancements**

As to *U.S. Sentencing Guidelines Manual § 2B1.1*, intended loss need not be limited to the amount the defendant is capable of inflicting. Nonetheless, the calculation of intended loss cannot be purely speculative. There must be a reasonable estimate of the intended loss that the defendant was attempting to inflict. The U.S. Court of Appeals for the Fifth Circuit uses a fact-specific, case-by-case inquiry into the defendant's intent in determining intended loss. Although it may be theoretically possible to intend a loss that is greater than the potential actual loss, Fifth Circuit case law requires the government to prove by a preponderance of the evidence that the defendant had the subjective intent to cause the loss that is used to calculate his offense level.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

**HN19[] Sentencing Guidelines, Adjustments & Enhancements**

The application notes to the sentencing guidelines establish a special framework, notwithstanding the general provisions of *U.S. Sentencing Guidelines Manual § 2B1.1*, cmt., application n. 3(A), for cases involving government benefits, including grants. *§ 2B1.1*, cmt., application n. 3(F)(ii). Commentary contained in U.S. Sentencing Guidelines Manual application notes is authoritative unless it violates the U.S. Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline. For cases involving government benefits, loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be. *§ 2B1.1*, cmt., application n. 3(F)(ii). The application note provides an example: If the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50. *§ 2B1.1*, cmt., application n. 3(F)(ii). The intended loss analysis applies to such cases: The intention to divert funds from the government for unintended uses qualifies the amounts as intended losses.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

**HN20[] Sentencing Guidelines, Adjustments & Enhancements**

The government benefits rule was instituted to clarify that even if benefits flowed through an unauthorized intermediary, as long as they went to intended recipients or intended uses, the amount of those benefits should not be included in loss. A defendant should not be held accountable for the total amount of benefits obtained when some portion of that benefit would have been obtained absent the fraudulent conduct. Instead, the correct loss calculation is the difference between the

amount the defendant actually received and the amount he would have received absent the fraud—in other words, the amount of loss based on the amount of excess benefits received as a result of fraud.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

Evidence > Burdens of Proof > Allocation

Evidence > Burdens of Proof > Preponderance of Evidence

**HN21[] Sentencing Guidelines, Adjustments & Enhancements**

Generally, it is the government's burden to show by a preponderance of the evidence the amount of loss attributable to fraudulent conduct.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

Criminal Law & Procedure > ... > Fraud Against the Government > False Statements > Penalties

**HN22[] Sentencing Guidelines, Adjustments & Enhancements**

A defendant's false statement in seeking government benefits is insufficient to render him accountable for all benefits received or intended to be received.

Criminal Law & Procedure > ... > Fraud > Fraud Against the Government > General Overview

Evidence > Burdens of Proof > Burden Shifting

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

**HN23[] Fraud, Fraud Against the Government**

Where a defendant has defrauded the government to such an extent that an accurate loss calculation is not possible, the burden shifts to the defendant to identify which benefits are legitimate. If the defendant fails to make such a showing, the district court may treat the entire claim as intended loss.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

**HN24[] Sentencing Guidelines, Adjustments & Enhancements**

The expectation of receiving a substantial amount of money is insufficiently specific to base a calculation of intended loss. Substantial sums cannot constitute an estimate of an intended benefit for the purpose of the sentencing guidelines enhancement.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

Criminal Law & Procedure > ... > Bribery > Public Officials > Penalties

**HN25[] Sentencing Guidelines, Adjustments & Enhancements**

The guideline commentary defines the value of the benefit received or to be received as the net value of such benefit. U.S. Sentencing Guidelines Manual § 2C1.1(b)(2)(A), cmt., application n. 2. The commentary provides two examples: (1) A government employee, in return for a $500 bribe, reduces the price of a piece of surplus property offered for sale by the government from $10,000 to $2,000; the value of the benefit received is $8,000. (2) A $150,000 contract on which $20,000 profit was made was awarded in return for a bribe; the value of the benefit received is $20,000. Do not deduct the value of the bribe itself in computing the value of the benefit received or to be received. In the above examples, therefore, the value of the benefit received would be the same regardless of the value of the bribe. § 2C1.1, cmt., application n. 2.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

**HN26[] Sentencing Guidelines, Adjustments &**

**Enhancements**

Where a defendant uses fraud to procure a contract but intends to provide the contracted for services, the defendant should not be characterized as causing as much loss as one who intends to totally cheat the victim, giving nothing in return.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

Criminal Law & Procedure > ... > Bribery > Public Officials > Penalties

**HN27[] Sentencing Guidelines, Adjustments & Enhancements**

The application note to *U.S. Sentencing Guidelines Manual § 2C1.1* provides that the value of the benefit received or to be received means the net value of such benefit. *§ 2C1.1*, cmt., application n. 3. The guidelines' use of the phrase "net value" does not mean net profits. Instead, the U.S. Court of Appeals for the Fifth Circuit has distinguished between direct costs—which are properly deducted from the benefits calculation—and indirect or fixed costs, which are not.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

**HN28[] Sentencing Guidelines, Adjustments & Enhancements**

A sentencing court need only make a reasonable estimate of the loss. *U.S. Sentencing Guidelines Manual § 2B1.1*, cmt., application n. 3(C).

**Counsel:** For UNITED STATES OF AMERICA, Plaintiff - Appellee: Mary Patricia Jones, Assistant U.S. Attorney, Corey Ross Amundson, Helina S. Dayries, Assistant U.S. Attorney, U.S. Attorney's Office, Middle District of Louisiana, Baton Rouge, LA.

For THOMAS A. NELSON, JR., Defendant - Appellant: Page Anthony Pate, Atlanta, GA.

**Judges:** Before JONES, DENNIS, and HIGGINSON, Circuit Judges.

**Opinion by:** HIGGINSON

## Opinion

[*509] HIGGINSON, Circuit Judge:

Thomas A. Nelson, Jr., the former mayor of New Roads, Louisiana, appeals his conviction for corruption-related offenses, along with the district court's calculation of his sentencing range. For the reasons articulated below, we AFFIRM Nelson's conviction, VACATE his sentence, and REMAND for resentencing consistent with this opinion.

**FACTS AND PROCEDURAL HISTORY**

**A. Facts**

The government's interest in Nelson arose from its undercover investigation of another Louisiana mayor, George Grace. As part of that investigation, Federal Bureau of Investigation ("FBI") agents and paid cooperating witness William Myles posed as representatives of a waste container cleaning system business known as the Cifer 5000 ("Cifer"). The [**2] FBI instructed Myles, a businessman with a real estate development background, to be "very overt" about his willingness to participate in corrupt activity to obtain government contracts.

Through his conversations with Grace, Myles discovered that Grace considered Nelson, along with four other mayors, to be part of a close-knit group that Grace [*510] was "training." Although Myles may have been the first to use the term "A-Team" to describe this group, Grace picked up on the moniker. Grace identified Nelson as likely willing to accept cash, rather than stock options, in exchange for helping Cifer. Grace also singled out another member of this group of five as a "clean" politician who would want to do things "straight up," which Myles understood to imply that the others would not.

Myles, at Grace's suggestion, invited Grace, Nelson, and Lewis, another member of Grace's A-Team, to dinner at a steak house in Baton Rouge in August 2008. Myles paid for dinner and made it "absolutely" clear that he was trying to get contracts for Cifer's services in the mayors' towns. On October 1, 2008, Myles and Grace met privately to discuss the A-Team mayors further;

Grace told Myles that the other mayors would [**3] "listen and do what I tell them." After Myles mentioned "tak[ing] care of" the mayors in return for Cifer contracts in their towns, Grace said, "Well, I know Nelson, from New Roads. He ready to go." Grace also instructed Myles that he would act as a middleman between Myles and the other mayors. According to Grace, the mayors trusted Grace enough to believe that he would take the fall if the group got into trouble.

Myles and FBI special agents, in their undercover capacity as Cifer representatives, met with Grace, Nelson, and two other A-Team mayors at Myles's New Orleans condo on October 6, 2008. Myles had asked Grace not to invite the mayor whom Grace identified as "clean." Cifer paid for the mayors' hotel rooms for the night and provided them with tickets to a Saints game. At the meeting, Myles explained to the mayors the legal bidding process for securing public contracts, but also told the group: "I might not even talk to you outside of this room but this is the group that helping us and since y'all guys willing to help us, we willing to help you guys." After Nelson expressed particular enthusiasm for Cifer, one of the agents asked whether Nelson could secure the contract himself [**4] or whether it would need to be put to a city council vote. Nelson responded: "[Y]ou're talking about RFPs [a step in the formal bidding process] and all those thing[s], but you could—I could probably look at it almost as a professional service." He continued: "So if it's a professional service, then I make the call . . . . The Council doesn't make the call on that." Myles understood Nelson to mean that he was willing to circumvent the RFP bidding process.

At some point during the evening, Grace and an FBI agent, Johnson, went into another room and Johnson gave Grace $2,000 in cash. Later that night, Grace came to Nelson's hotel room and gave Nelson $300 in cash, telling him the money was from Johnson. Grace told Nelson that he could "do whatever he wanted" with the money, but Nelson later characterized the $300 payment as a quid pro quo: "If I'm going to accept, I mean I couldn't, you know, I'm going to perform." Nelson and one of the other mayors agreed that they would not speak about the payments again.

Nelson met with Cifer "businessmen," including Myles and Johnson, again on October 30, 2008. At that meeting, Nelson accepted $400 in cash from Johnson and a ticket to a Hornets game [**5] from Myles. The group discussed having Nelson write an official "letter of support" to give to investors. The next day, October 31, 2008, Nelson told Myles: "Y'all tell me when the time is right to make the move on, we can do it. And the sooner we get this knocked out, then we can get the other little deal I was telling you about." Myles testified that the "other little deal" referred to Nelson seeking financial backing for his own business venture, a "video bingo" project.

[*511] On November 11, 2008, Nelson sent a letter to a "private investment group," Quorum Venture Group, which had also been set up by the FBI, in support of Cifer. In the letter, Nelson noted that New Roads was "committed to working towards a contract with" Cifer. Nelson also drafted a proposed city ordinance requiring the cleanliness of garbage cans in order to benefit Cifer. He published an article in support of the ordinance in the local paper.

On January 27, 2009, Nelson replied to Johnson's offer of a silent partnership in Cifer by saying: "That sounds good . . . . I'm with that." A few days later, Nelson told Myles that Johnson had "told me some stuff that made me—I'm even more ready to roll than y'all." During this [**6] time, Nelson also sought Cifer representatives' financial backing for several business ventures of his own.

In February 2009, Nelson instructed a city employee to send a request to the Louisiana Department of Environmental Quality, seeking support for legislation favorable to Cifer. On March 4, 2009, Johnson offered Nelson $20,000 in stock in an electronic medical records business in exchange for Nelson's support of Cifer; Nelson agreed. Johnson told Nelson they could delay the decision, but Nelson said that he was "ready right now." In April 2009, Nelson solicited football playoff tickets from FBI undercover agent Mike King while rejecting a similar offer from a representative of another company. Nelson told King that he trusted Cifer.

King offered Nelson $20,000 in cash, instead of stock, on May 20, 2009. Nelson refused, saying he preferred the stock because it could "bring so much more in the future." But in July, Nelson changed his mind about preferring stock to cash after hearing of an undercover FBI operation involving public officials in New Jersey. King reassured Nelson that he could decline the bribe altogether, saying: "If you're comfortable [helping Cifer] for the right reasons, [**7] let's do it for the right reasons." Nelson continued to request the cash. On September 16, 2009, Nelson told King he wanted to be paid in a week. Nelson accepted $5,000 on September 24, 2009, and another $5,000 on October 8, 2009. King told Nelson he would get the remaining $10,000 when

Cifer was set up in New Roads.

In October 2009, Nelson used New Roads's "robo call" system to disseminate a pre-recorded message to the town's residents, from him as mayor. The message described the Cifer system and stated that "we are not advocating that the Cifer 5000 alone will cure the H1N1 outbreak, what we are saying is that your risk of contracting this virus or any other will be significantly minimized." The message ended by asking the recipient to press a button on their keypad if he or she is "interested in the Cifer 5000 performing this service in our community for a short period of time free of charge."

In April 2010, Nelson was interviewed by an FBI agent about a report by the City of New Roads that city offices might have been bugged by a disgruntled employee; when asked if he had been bribed, Nelson failed to mention his involvement with Cifer.

Nelson contacted Myles on April 26, 2010, to [**8] say that he was running for re-election and he needed Cifer trucks "on the ground" in New Roads, as well as money for campaign funds. Nelson told Myles that Johnson should "empty his pockets" and give Nelson the remaining $10,000. Nelson later told Myles that if he did not receive the money within a week, he would impose interest "so high where y'all can't make it up." Myles promised to give Nelson the money, but only if Nelson would award Myles a city contract for [*512] Cifer's services in the fall. Nelson agreed and also agreed to provide an official letter to the Environmental Protection Agency ("EPA") in support of Cifer's grant request.

Nelson sent a letter on Cifer's behalf to the EPA Administrator, signed and printed on mayoral letterhead, on May 3, 2010. The letter was written mainly by undercover agents but edited by Nelson; it read in part:

> Recently, I met with other mayors from Pointe Coupee Parish, Louisiana, and there was an overwhelming interest from the mayors in a technology like the Cifer 5000. A municipal joint venture was discussed wherein any federal financial assistance from the EPA would be shared parish-wide in order to afford many cities the opportunity to implement [**9] a regimented sanitation container cleaning system in compliance with the EPA rules and regulations.

At trial, the government introduced evidence that the meeting between Nelson and the other mayors never took place. The letter concluded by requesting the EPA to "tak[e] a leadership role in promoting the development and implementation of standards for the sanitation of waste containers—perhaps under the auspices of federal grants allowing municipalities to invest in technologies such as the Cifer 5000." In return for the letter and a verbal guarantee of a city contract with Cifer in the fall, Myles paid Nelson the remaining $10,000 in two installments.

Nelson asked Myles to hire him to promote Cifer to other public officials in exchange for ten percent of profits from contracts secured. Nelson said that his "money goal" for the scheme was to "stack a few mill[ion]." Nelson anticipated that Cifer might be bought out and told Myles that he did not want its owners to "walk away with $300 million and leave [Nelson] with some chump change." Nelson also reassured Myles that his wife would not be suspicious about any influx of money because she "had to know what she was getting into before she [**10] got into it . . . . She knew my family was political from the gitty-up."

During the course of the investigation, Nelson told Myles that he had cultivated relationships with other companies in addition to Cifer. For example, he told Myles that "he threw in the extra lagniappe"—referring to $444,000—to PEC, an engineering firm that had been awarded a contract worth several million, as part of a quid pro quo. Myles understood Nelson to mean, "I do something for them, they do something for me." When Myles asked what Nelson would do if another firm offered to do the same work for 30% less than PEC, Nelson responded that the other firm could talk "to the next mayor coming in." Nelson also told an FBI agent that at the same time he was dealing with Cifer, he was "taking care of" a New Roads company called Wildgame Innovations: "I . . . gave them $100,000 to set up . . . they'll tell you . . . the mayor took care of us . . . But everything they needed to set up, from the Capitol, I've been working with them on legislation."

The undercover investigation of Nelson ended on May 20, 2010, when FBI agents identified themselves to Nelson as he was leaving a meeting with Myles, and Nelson admitted [**11] to soliciting and receiving bribes.

### B. Procedural History

Nelson originally agreed to plead guilty to a bill of information charging him with bribery involving an entity receiving federal funds in violation of *18 U.S.C. § 666(a)(1)(B)*. The plea agreement was signed by Nelson, his attorneys, and the prosecution. Included in the agreement was a stipulated factual basis stating in

part that "[f]rom on or about October 6, [*513] 2008"—the date of the first condo meeting—"through on or about May 20, 2010, Nelson used his position as Mayor to promote the Cifer 5000 in the City and elsewhere in exchange for cash and other things of value totaling $22,053." The agreement contained a waiver clause providing that if Nelson failed to plead guilty, "any information provided by the defendant," including "but not limited to[] the factual stipulation contained in this Plea Agreement," "may be used against [Nelson] in this or any other prosecution."

After signing the plea agreement, Nelson switched attorneys and informed the United States that he no longer wished to plead guilty. The government sought to admit statements made by Nelson in the plea agreement, including in the stipulated factual basis. Over [**12] the defense's objection, the district court ruled that the stipulated factual basis was admissible but that the plea agreement itself was not.

At trial, the government called Mary Olive Pierson, Nelson's attorney during the plea-bargaining stage, to testify about the circumstances surrounding Nelson's signing of the stipulated factual basis. The district court allowed the testimony over the defense's objection, and the government introduced the factual stipulation into evidence through Pierson's testimony. The defense also objected to the government's motion to admit video excerpts of a recorded conversation between Myles and Grace. The district court admitted the evidence under the co-conspirator hearsay exclusion.

The district court denied the defense's request for a jury instruction on entrapment, finding that Nelson had not established a prima facie case of entrapment. The district court found that Nelson accepted the $300 in cash, the hotel room, and the Saints ticket as bribes in October 2008 and that those transactions were sufficient to indicate predisposition. The district court instructed the jury that "entrapment is not an issue and should not be considered by you."

The jury [**13] found Nelson guilty on all counts. At sentencing, the district court determined the applicable guidelines range to be between 235 and 293 months. However, noting Nelson's young family and lack of criminal history, and describing his gain from the scheme as "minimal," at least compared to the intended loss amount, the district court varied downward under 18 U.S.C. § 3553(a) and imposed concurrent sentences of 132 months and 60 months, as well as two years of supervised release.

## DISCUSSION

Nelson argues that the district court erred at trial by refusing to instruct the jury on the affirmative defense of entrapment; by admitting statements made by Grace about Nelson's propensity towards corruption; by admitting the stipulated factual basis for the plea agreement into evidence; and by allowing Nelson's former attorney to testify about the circumstances surrounding Nelson's signing of the factual basis. Nelson also asserts that the district court erred at sentencing in its calculation of the intended loss amount resulting from the fraudulent grants and contracts Nelson attempted to help secure. We address these claims in order.

### A. Entrapment Instruction

**HN1**[] We review the district court's decision [**14] not to grant an entrapment instruction *de novo*, looking at the evidence in the light most favorable to the defendant. United States v. Theagene, 565 F.3d 911, 918 (5th Cir. 2009); *United States v. Bradfield, 113 F.3d 515, 521 (5th Cir. 1997)*. Entrapment is an affirmative defense that "operates through a burden shifting regime." Theagene, 565 F.3d at 918. Generally, [*514] entrapment is a question for the jury, not for the court. Mathews v. United States, 485 U.S. 58, 63, 108 S. Ct. 883, 99 L. Ed. 2d 54 (1988). But in order for an entrapment instruction to be put to the jury, a defendant must make a prima facie showing of two elements: (1) lack of predisposition to commit the offense and (2) "some governmental involvement and inducement more substantial than simply providing an opportunity or facilities to commit the offense." Theagene, 565 F.3d at 918. Both elements pose the same ultimate question: "whether criminal intent originated with the defendant or with government agents." *Bradfield, 113 F.3d at 521*.

**HN2**[] The "principal element in the defense of entrapment" is predisposition. Mathews, 485 U.S. at 63 (internal quotation marks omitted). To determine whether the defendant lacked predisposition, we consider whether he "intended, [**15] was predisposed, or was willing to commit the offense *before first being approached by government agents*." Theagene, 565 F.3d at 919 (internal quotation marks omitted). A defendant lacks predisposition where he had no prior interest or experience related to the crime, displayed "significant hesitation or unwillingness, or attempt[ed] to return discussion to lawful conduct." Id. at 920; *see,*

*e.g.*, *Bradfield*, *113 F.3d at 521* (holding no predisposition when government informant propositioned defendant approximately eighteen times before the defendant agreed to participate in a drug deal).

By contrast, if the evidence suggests that the defendant was an "'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime," then predisposition is present. *Theagene, 565 F.3d at 919* (quoting *Mathews, 485 U.S. at 63*). Evidence to show predisposition may include "active, enthusiastic participation" or "demonstrated expertise in the criminal endeavor." *Id*. If a defendant displays such expertise or enthusiasm yet fails to show "any hint of hesitation or unwillingness," we will find predisposition. *See id. at 919-20*.

Nelson argues that he made a prima facie showing of lack of [**16] predisposition. Specifically, he contends that his acceptance of the first $5,000 cash payment in 2009 followed an "intense campaign of solicitation" that had begun on October 6, 2008, when the mayors attended their first meeting at Myles's condo. The district court found that the hotel room, Saints ticket, and $300 in cash that Nelson accepted on October 6, 2008 were not part of a "wining and dining" campaign or mesh to entrap but were themselves bribes, taken by Nelson "with the agreement to perform official acts." Nelson argues that, viewed in the light most favorable to the defendant, the events of October 6, 2008, were "no more indicative of criminality than innocence."

Nelson cites *Theagene*, a case in which this court remanded for an entrapment instruction when the evidence could support a lack of predisposition. *565 F.3d at 920-21*. In that case, the defendant sent $500 to an Internal Revenue Service ("IRS") agent with a note describing the cash as "a token." *Id. at 921* (internal quotation marks omitted). The defendant testified that he meant the cash to count towards the repayment of his overdue taxes as a signal of good faith in case his check bounced and that he included the [**17] "token" note to signify that he recognized the $500 was only a nominal step towards repaying his debts. *Id. at 920-21*. We explained also that it was "highly relevant to predisposition" that even the IRS agent testified that at some point he doubted whether the defendant intended bribery. *Id. at 921*. Thus, we determined that the defendant presented a "plausible enough" [*515] story such "that the jury deserved a chance to evaluate" whether bribery was on the defendant's mind before the IRS agent suggested it. *Id. at 922*.

Nelson, by contrast, has not presented a plausible innocent explanation for accepting the money and other gifts offered to him on October 6, 2008. Before taking the cash, Nelson suggested to Myles that he could circumvent the formal process for awarding city contracts; some time after the meeting, he himself described the hotel room, Saints ticket, and cash as offers that he felt he needed to repay with political favors. Nelson said he "felt like it was . . . if you gonna do this, if I'm going to accept . . . I'm going to perform . . . I'm not just gonna sit in there and say . . . this is really nice, now I mean, who just does that?" In addition, the signed factual basis for [**18] the plea agreement, which we conclude was properly admitted at trial, *see infra*, stated that the bribes began on October 8, 2008.

***HN3***[🡅] "*[I]ndependently motivated behavior* that occurs *after* government solicitation begins" may constitute evidence of predisposition. *United States v. Brace, 145 F.3d 247, 262 (5th Cir. 1998)* (quoting *United States v. Byrd, 31 F.3d 1329, 1336 (5th Cir. 1994)*) (internal quotation marks omitted). The government presented evidence that Nelson discussed with undercover agents his corrupt dealings with other companies unrelated to Cifer. For example, Nelson said that he was "taking care of" a company called Wildgame Innovations, had given them $100,000 of public funds, and was "working with them on legislation." Further, ***HN4***[🡅] "a defendant's ready and willing participation in government-solicited criminal activity, standing alone, is sufficient to prove predisposition." *United States v. Reyes, 239 F.3d 722, 739 (5th Cir. 2001)*. By accepting bribes, and doing so without reluctance, Nelson was an "active, enthusiastic participa[nt] in the crim[e]." *Theagene, 565 F.3d at 919* (internal quotation marks omitted). In fact, Nelson's request for $10,000 from Cifer came after undercover [**19] agents suggested that they forget the bribe and move forward with the contract "for the right reasons." *See United States v. Cavazos, 162 F.3d 1160 (5th Cir. 1998)* (***HN5***[🡅] "Many factors indicate a defendant's predisposition, including a showing of defendant's desire for profit, his eagerness to participate in the transaction, his ready response to the government's inducement offer, or his demonstrated knowledge or experience in the criminal activity under investigation.") (internal quotation marks omitted).[1]

---

[1] Nelson notes that he declined certain offers from the government, including Myles's offer to take him on a hunting trip, but the record does not support that he did so out of concern for their potential illegality nor that he displayed "significant hesitation or unwillingness" in entering into a criminal scheme.

Because we conclude that Nelson made no plausible showing of lack of predisposition, we affirm the district court's decision not to give an entrapment instruction.

### B. Evidentiary Rulings

#### 1. Co-conspirator Hearsay Statements

Nelson challenges the district court's admission of Grace's recorded statements, made on October 1, 2008, about Nelson's inclinations towards corrupt activity. [**20] The district court admitted the statements under the coconspirator hearsay exclusion. ***HN6***[] Under *Federal Rule of Evidence 801(d)(2)(E)*, an opposing party's statement is not considered hearsay if it was "made by the party's coconspirator during and in furtherance of the conspiracy." We will "review the admission of hearsay evidence under the non-hearsay [*516] definition of *Rule 801(d)(2)(E)* for abuse of discretion." *United States v. Robinson, 367 F.3d 278, 291 (5th Cir. 2004)* (internal quotation marks omitted).

To establish a foundation for admission of evidence under this exclusion, the government show "(1) the existence of a conspiracy, (2) [that] the statement was made by a co-conspirator of a party, (3) the statement was made during the course of the conspiracy, and (4) the statement was made in furtherance of the conspiracy." *Id*. (internal quotation marks omitted). The statement itself must be considered but cannot by itself establish "the existence of the conspiracy or participation in it." *Federal Rule of Evidence 801(d)(2)*. There must be "independent evidence" establishing the conspiracy. *United States v. El-Mezain, 664 F.3d 467, 502 (5th Cir. 2011)*.

Nelson argues that the government failed [**21] to show the existence of a conspiracy between Nelson and Grace. ***HN7***[] A conspiracy for the purpose of the hearsay exclusion need not be unlawful; the statement may be made in furtherance of a "lawful joint undertaking." *Id*. A conspiracy may be shown "merely by engaging in a joint plan[] . . . that was non-criminal in nature." *Id*. Thus, "a statement is not hearsay if it was made during the course and in furtherance of a common plan or endeavor with a party." *Id* (internal quotation marks omitted). For example, this court has admitted a ship's logbook under the co-conspirator exclusion because the ship's crew were engaged in the voyage of the ship, which was "a joint venture in and of itself apart from the illegality of its purpose, and the logbook was created in furtherance of the voyage." *Id*. (quoting *United States v. Postal, 589 F.2d 862, 886 n.41 (5th Cir. 1979))* (internal quotation marks omitted).

Nelson argued that there was no evidence that he and Grace shared a common purpose—for example, to share profits from a corrupt venture with each other. But Nelson cites cases relating to the requirements for conspiracy as a crime, not as a hearsay exclusion. Before Grace made the challenged statements [**22] on October 1, Nelson, Grace, and another mayor attended a dinner with Myles, during which Myles discussed the potential benefits of Cifer for the mayors' communities. Nelson told FBI agents that he understood Grace was the one who was "putting the whole Cifer deal together." The district court did not abuse its discretion in finding that Grace and Nelson were, at the least, engaged in a common scheme to recruit Cifer's business to their towns.[2] At the dinner it was "clear that [Myles was] trying to get a contract in the towns of the different mayors that were there."

#### 2. Admission of Factual Basis

***HN8***[] *Federal Rule of Evidence 410* prohibits the use of "a guilty plea that was later withdrawn" or a "statement made during a proceeding on" that plea under *Rule 11*. Nelson argues that the admission of [**23] his signed factual basis violates this Rule. The government responds that the plea agreement contained an enforceable waiver provision stating that even if Nelson decided not to plead guilty, the factual basis could be used against him in a future prosecution.

***HN9***[] A district court's admission of evidence, if objected to, is reviewed for abuse of discretion. *United States v. Sylvester [*517] , 583 F.3d 285, 288 n.4 (5th Cir. 2009)*. "[D]e novo review of attendant legal issues "is a component part of that abuse of discretion review." *Id*. The Supreme Court has held that "absent some affirmative indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea-statement Rules

[2] Nelson also asserts that Grace's statements violated the *Confrontation Clause*. Nelson does not point to a *Confrontation Clause* objection preserved at trial and he has failed to fully brief the issue on appeal. Moreover, Nelson describes Grace's statements as "non-testimonial," but the *Confrontation Clause* extends only to testimonial statements. *See Brown v. Epps, 686 F.3d 281, 286 (5th Cir. 2012)*.

is valid and enforceable." United States v. Mezzanatto, 513 U.S. 196, 210, 115 S. Ct. 797, 130 L. Ed. 2d 697 (1995). This court in *Sylvester* allowed the government to use the defendant's statements, made during plea negotiations, in its case-in-chief, provided that "the defendant, as a condition to engaging in negotiations with the government, knowingly and voluntarily waived all rights to object to such use." 583 F.3d at 288; *see also* United States v. Mitchell, 633 F.3d 997, 1006 (10th Cir. 2011) [**24] (collecting cases). *But cf.* United States v. Newbert, 504 F.3d 180, 186-87 (1st Cir. 2007) (declining to find a breach of the agreement sufficient to enforce a waiver of rights where the waiver provision did not define breach and where the defendant possessed newly-discovered evidence "that he could not . . . have discovered" before pleading guilty and that "establish[ed] a plausible basis for concluding that the defendant was not guilty").

Nelson argues that this case is distinguishable from *Sylvester* because the government in *Sylvester* detrimentally relied on the plea agreement by offering the defendant life imprisonment rather than the death penalty and by using the factual statements in debriefing sessions. Although "[a] plea agreement is interpreted in accordance with general principles of contract law," United States v. Harper, 643 F.3d 135, 139 (5th Cir. 2011), the *Sylvester* court did not base its conclusion on the government's reliance on the agreement. Instead, the court adhered to the Supreme Court's rationale in *Mezzanatto* that admitting factual bases will aid the truth-finding process. *See* Sylvester, 583 F.3d at 290 (citing Mezzanatto, 513 U.S. at 204). While Nelson argued [**25] at trial, and references on appeal, that the factual stipulation was composed with "no real input [from] the defendant whatsoever," as we noted in *Sylvester*, "[w]hile in theory an innocent defendant might execute such a waiver . . . the benefit of evaluating as much relevant evidence as possible outweighs the mere possibility of such danger, and will, on balance, enhance the reliability of a fact-finder's conclusions." Id. at 294. The statements made in *Sylvester* were arguably less reliable than those at issue here: there was no threat of the death penalty to potentially induce Nelson to incriminate himself; unlike the oral statements at issue in *Sylvester*, the stipulation here was reduced to writing and signed by Nelson, and the plea agreement explicitly provided that the government could admit the factual basis if Nelson failed to plead guilty to the Bill of Information. *Cf.* Sylvester, 583 F.3d at 289. Importantly, in both cases, counsel was involved in the waiver of Rule 410. We conclude that Nelson, with counsel, validly waived the exclusionary provisions of the plea-statement rules and that the district court did not abuse its discretion in allowing the stipulated factual basis [**26] into evidence.

### 3. Former Defense Attorney Testimony

Nelson argues that in testifying about the circumstances surrounding his signing the factual basis, his former attorney violated the attorney-client privilege and Nelson's Sixth Amendment right to counsel.[3] **HN10**[] "The application of the attorney-client [*518] privilege is a question of fact, to be determined in the light of the purpose of the privilege and guided by judicial precedents. The clearly erroneous standard of review applies to the district court's factual findings. We review the application of the controlling law *de novo*." United States v. Neal, 27 F.3d 1035, 1048 (5th Cir. 1994) (citation omitted) (internal quotation marks omitted). To assert the privilege, a party must show: (1) a confidential communication; (2) to a lawyer or subordinate; (3) for the primary purpose of securing a legal opinion, legal services, or assistance in the legal proceeding. United States v. Robinson, 121 F.3d 971, 974 (5th Cir. 1997). The privilege does not protect "everything that arises out of the existence of an attorney-client relationship," United States v. Pipkins, 528 F.2d 559, 563 (5th Cir. 1976). An attorney-client communication is also protected under [**27] the Sixth Amendment "if it is intended to remain confidential and was made under such circumstances that it was reasonably expected and understood to be confidential." United States v. Melvin, 650 F.2d 641, 645 (5th Cir. Unit B July 1981).

The government called Nelson's former attorney, Mary Pierson, to testify regarding the circumstances surrounding Nelson's signing his plea agreement. The prosecutor told the district court that the purpose of the testimony was "to establish that the statement was voluntary[] . . . so that the jury doesn't get the wrong idea. . . . This is the only way that we can establish the voluntariness of the statement." Noting that it was the government's burden to show voluntariness, the court allowed "limited inquiry of" Pierson.

The government admitted the factual basis into

[3] Nelson does not reiterate on appeal his separate objection at trial to this testimony under Federal Rule of Evidence 403. *Cf.* Old Chief v. United States, 519 U.S. 172, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997).

evidence through Pierson's testimony, and she read it aloud to the jury. Pierson confirmed the authenticity of the document and of Nelson's signature. She stated that Nelson's signature on the document indicated that [**28] she and Nelson had "read [the document] together, and he had read it, and he understood it and agreed with it." She testified that before Nelson signed the document, they had a "lengthy discussion." She did not discuss the details of the conversation. Pierson confirmed that Nelson came to her office of his own free will to sign the document and there were no government officials present. She stated that she was not aware of any coercion or threats made against Nelson and, when asked if Nelson signed the document "knowingly and voluntarily," Pierson responded, "I believe so." The government attempted to ask about specific facts referenced in the document, but the court sustained an objection by Nelson that "the document speaks for itself."[4] The government argues that Pierson's testimony regarding the contents of the factual basis itself was not confidential and therefore not privileged. *See* Robinson, 121 F.3d at 976. Nelson, however, primarily challenges Pierson's testimony regarding the circumstances of his signing the agreement.

[*519] We have noted that **HN12**[] "[t]he mere appearance of an attorney testifying against a former client[] . . . is distasteful and should only be used in rare instances." *United States v. Cochran, 546 F.2d 27, 29 n.5 (5th Cir. 1977)*. We have, nonetheless, allowed attorneys, in narrow circumstances, to testify about their former clients' mental competence. *See Clanton v. United States, 488 F.2d 1069, 1071 (5th Cir. 1974)*. We concluded that an attorney's evaluation of his client's mental competency during plea bargaining did not constitute private, confidential communications because the attorney was as "qualified as a layman to express a view as to his client's mental competency." *Id*. "Excluded [**30] from the privilege[] . . . are the physical characteristics of the client, such as his . . . demeanor, his bearing, his sobriety . . . . Such things are observable by anyone who talked with the client." *Id*. (quoting *United States v. Kendrick, 331 F.2d 110, 113-14 (4th Cir. 1964)*) (internal quotation marks omitted); *see also Malinauskas v. United States, 505 F.2d 649, 655 (5th Cir. 1974)* (attorney-client privilege was not violated when a defendant's former attorney testified that, "from his observations and discussions with [the defendant] he could find no indication that he was incompetent or under the influence of drugs").

Pierson's testimony, however, was not confined to observations about Nelson's demeanor that could have easily been made by a layperson; nor was it offered outside the presence of a trial jury on a narrow issue like competency or voluntariness.[5] Instead, it was trial testimony that described a meeting held "for the primary purpose of securing . . . a legal opinion" on whether to sign the agreement. *See* Robinson, 121 F.3d at 974. Called by the government, defense counsel Pierson testified that her former client in this case, Nelson, read the plea agreement admitting [**31] to federal criminal offense conduct with her, that he "understood" and "agreed with" it, and that he signed it only after a "lengthy discussion" with his experienced attorney. Such information reveals more than the plain fact of the voluntariness of Nelson's signature on a guilty plea attestation and document inclusive of the offense's factual basis, and we conclude that it is protected by the attorney-client privilege. *See Fed. R. Evid. 501*; *see also* Fed. R. Evid. 104(a), (c).

Although Pierson's testimony falls under the attorney-client privilege, we nonetheless conclude that its admission in this case was harmless error. *See* Robinson, 121 F.3d at 977; *United States v. Jiminez-Lopez, 873 F.2d 769, 771 (5th Cir. 1989)*;. **HN15**[] "Where objected to testimony is cumulative of other testimony that has not been objected to, the error that [**32] occurred is harmless." *United States v. Griffin, 324 F.3d 330, 348 (5th Cir. 2003)*. The prosecutor had Pierson read the stipulation aloud, but the district court already had ruled that the stipulation was admissible

[4] We take this opportunity to observe that **HN11**[] the opinion testimony of a witness with personal or expert knowledge, helpful and pertaining to a document, is not [**29] objectionable on the ground that the document "speaks for itself." *See* **Fed. R. Evid. 701**, 702. Properly made, such an objection may pertain to the character and scope of testimony under Rules 403 and 611. The original writings rule, Rule 1002, however, should not be misunderstood as a "best evidence" device to exclude otherwise admissible opinion testimony interpreting a writing after it has been introduced into evidence. *See* Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence* § 10.6, at 1158 (4th ed. 2009).

[5] *See* Fed. R. Evid. 104(a) (**HN13**[] "The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible."); *see also* Fed. R. Evid. 104(c) (**HN14**[] "The court must conduct any hearing on a preliminary question so that the jury cannot hear it if: (1) the hearing involves the admissibility of a confession[] . . . .").

due to Nelson's Rule 410 waiver. In fact, Nelson objected to the testimony in part because it was "cumulative and unnecessary," considering the content of the stipulation would go before the jury either way. Pierson testified that Nelson signed the document knowingly and voluntarily, but Nelson explicitly abandoned his arguments on those issues at trial. The overriding content of Pierson's testimony indicated that Nelson considered the contents of the factual basis and did not sign it unknowingly [*520] or involuntarily. Notably, Pierson herself, and then also the district court in rulings limiting government inquiry, restricted testimony to avoid conversation going to matters other than the knowing and voluntary signing of the factual basis. Viewing the record "in its entirety," we conclude that any error in admitting Pierson's testimony was harmless. *See* Griffin, 324 F.3d at 348.

**C. Sentencing Loss Calculation**

Nelson argues that the district court arrived at the wrong guidelines [**33] sentencing range by miscalculating the value of his bribery activity. ***HN16***[] Although we review the district court's loss calculations for clear error, United States v. Scher, 601 F.3d 408, 412 (5th Cir. 2010), we review the district court's *method* of determining the amount of loss, as well as its interpretations of the meaning of a sentencing guideline, *de novo*. United States v. Harris, 597 F.3d 242, 251 (5th Cir. 2010); United States v. Roussel, 705 F.3d 184, 197 (5th Cir. 2013).

***HN17***[] The sentencing guidelines provide that the offense level for bribery-related offenses is to be increased as follows:

> If the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $5,000, increase by the number of levels from the table in § 2B1.1 . . . corresponding to that amount.

U.S.S.G. § 2C1.1(b)(2). The application notes to § 2B1.1 state that for the purpose of this calculation, "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). Intended loss "means the pecuniary [**34] harm that was intended to result from the offense" and "includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." *Id*. cmt. n.3(A)(ii).

***HN18***[] Intended loss need not be limited to the amount the defendant is "capable of inflicting." United States v. Edwards, 303 F.3d 606, 645 n.27 (5th Cir. 2002). Nonetheless, the calculation of intended loss cannot be "purely speculative." Roussel, 705 F.3d at 201. There must be a "*reasonable* estimate of the 'intended loss that the defendant was attempting to inflict.'" *Id*. We use a "fact-specific, case-by-case inquiry into the defendant's intent in determining 'intended loss.'" United States v. Isiwele, 635 F.3d 196, 203 (5th Cir. 2011). "Although it may be theoretically possible to intend a loss that is greater than the potential actual loss, our case law requires the government [to] prove by a preponderance of the evidence that the defendant had the subjective intent to cause the loss that is used to calculate his offense level." *Id*. (quoting United States v. Sanders, 343 F.3d 511, 527 (5th Cir. 2003)) (internal quotation [**35] marks omitted).

The district court increased Nelson's offense level by 18 corresponding to its valuation of the bribery amount at $6,382,000. *See* U.S.S.G. § 2B1.1(b)(1). Nelson suggests a 10-level increase corresponding to his suggested loss calculation of $152,000.[6] Nelson challenges the district court's calculations relating to three aspects of the [*521] bribery activity: first, the letter to the EPA; second, the letter to private investors; and third, the kickback scheme for public contracts. The district court valued the EPA letter at $4 million; the private investor letter at $2 million; and the kickback scheme at $250,000.

**1. EPA Letter**

Although not cited by the parties or the district court, ***HN19***[] the application notes to the sentencing guidelines establish a special framework, "notwithstanding" the general [**36] provisions of § 2B1.1 cmt. 3(A), for "cases involving government benefits," including "grants." U.S.S.G. § 2B1.1 cmt.

[6] Nelson does not challenge the $132,000 loss amount remaining, after subtracting the EPA and investor letter and kickback scheme valuations. Presumably, the $152,000 amount results from adding the $20,000 in cash bribes Nelson received, which Nelson argues should be considered as an alternative to the district court's assessment of potential gain for Cifer from the EPA and investor letters.

3(F)(ii); *see* United States v. Miller, 607 F.3d 144, 148 n.2 (5th Cir. 2010) ("Commentary contained in U.S.S.G. application notes is 'authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.'") (quoting Stinson v. United States, 508 U.S. 36, 38, 113 S. Ct. 1913, 123 L. Ed. 2d 598 (1993)) (internal quotation marks omitted).

For cases involving government benefits, "loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be." *Id*. The application note provides an example: "[I]f the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50." *Id*. The intended loss analysis applies to such cases: "The intention to divert funds from the Government for unintended uses qualifies the . . . amounts as 'intended losses.'" United States v. Dowl, 619 F.3d 494, 502 (5th Cir. 2010).

**HN20**[] The government benefits rule was instituted to clarify that even [**37] if benefits "flowed through an unauthorized intermediary, as long as they went to intended recipients or intended uses, the amount of those benefits should not be included in loss." United States v. Harms, 442 F.3d 367, 380 (5th Cir. 2006) (quoting U.S.S.G. app. C vol. II, at 180 (2010)) (internal quotation marks omitted). We have clarified that a defendant should not be held accountable for the total amount of benefits obtained, when some portion of that benefit would have been obtained absent the fraudulent conduct. *Id*. Instead, the correct loss calculation is "the difference between the amount the defendant actually received and the amount he would have received absent the fraud"—in other words, "the amount of loss based on the amount of excess benefits received as a result of fraud." *Id*. (emphasis added).

**HN21**[] Generally, it is the government's burden to show by a preponderance of the evidence the amount of loss attributable to fraudulent conduct. United States v. Hebron, 684 F.3d 554, 563 (5th Cir. 2012). The government's only evidence of Nelson's intended loss in this case—Nelson's understanding that the letter would "assist Cifer folks with obtaining a three to four million dollar [**38] grant from the EPA"—is insufficient to hold Nelson accountable for an intended loss amount of $4 million.[7] Nelson's expectation that Cifer might be eligible for a multimillion dollar grant does not constitute a reasonable estimation of the amount of government funds Nelson intended to divert using his letter of support. *See* Hebron, 684 F.3d at 563. The letter itself did not identify a requested grant amount, nor did it [*522] constitute a grant application. Instead, the letter merely suggested that the EPA "consider taking a leadership role in promoting the development and implementation of standards for the sanitation of waste containers—*perhaps* under the auspices of federal grants allowing municipalities to invest in technologies *such as* the Cifer 5000." (emphasis added). Nelson acknowledged he believed the letter would "*assist* Cifer folks . . . ," not that the letter would secure $4 million in grant money. The wording of Nelson's acknowledgment makes sense, because Cifer necessarily would have to complete various further steps on its own initiative and merit before receiving millions in federal funds. The record establishes that Nelson believed Cifer was a legitimate company with the ability [**39] to achieve its stated goals and put trucks on the ground in New Roads in a matter of months.

There is insufficient evidence to adequately differentiate between legitimate funding Cifer could have received from the EPA, and any benefits that Nelson intended to stem from this false statement in his letter that he had met with other mayors regarding Cifer and similar projects. **HN22**[] A defendant's false statement in seeking government benefits is insufficient to render him accountable for all benefits received or intended to be received. *See, e.g.*, United States v. Parsons, 109 F.3d 1002, 1005 (4th Cir. 1997) ("Just as in [a previous case] where the FDA's approval was not automatically revoked on the basis of a false statement, here an entire travel reimbursement claim was not automatically forfeited because it was partially fraudulent.").

**HN23**[] Where a defendant has "defraud[ed] the government to such an extent that an accurate [**40] loss calculation is not possible," we have held that "the burden shifts to the defendant" to identify which benefits are legitimate. Hebron, 684 F.3d at 563 (noting that if the defendant fails to make such a showing, the district court may treat the entire claim as intended loss). Here, we cannot find such "extensive and pervasive" fraud, at least with regard to the EPA grant. *See id*. Nelson's activity was limited to providing a letter of support, that, as noted above, was introductory in

[7] After Nelson signed the letter, Myles told him it was worth "$4 million for your town." Myles testified: "I had let him know that because of his letter that we could get federal assistance . . . if a municipality [said] that they were behind us, it is easy to raise the capital."

nature and did not specify a requested grant amount.

We therefore conclude that this case, although close, is one in which the amount of loss cannot reasonably be determined, and it may therefore be more appropriate to use "the gain that resulted from the offense as an alternative measure of loss." § 2B1.1, comment. (n.3(B)). The district court noted at sentencing, in response to Nelson's argument that he was "not sure [whether Cifer or New Roads would be] the intended beneficiary" of the grant money, that the EPA was part of an overall "scheme . . . with the expectation that [Nelson] himself would receive a substantial sum of money as a result of it." We have held, however, that **HN24**[] the expectation of [**41] receiving a "substantial" amount of money is insufficiently specific to base a calculation of intended loss. Roussel, 705 F.3d at 201 ("'Substantial sums' . . . cannot constitute an estimate of an intended benefit for the purpose of the sentencing guidelines enhancement."). The record in this case indicates that government agents requested the EPA letter in return for a $10,000 cash bribe. The FBI viewed the letter as Nelson's repayment—along with the promised Cifer contract with New Roads—for the $10,000 amount. As Myles testified, the letter was designed to add "realism" to the operation: "I don't look like a bank . . . I'm trying to advance my project. So I will give you that money if you do this for me. That would be normal in any normal businessman transaction." Thus, the most appropriate valuation of the EPA [*523] letter may be the amount Nelson received for writing it, i.e., $10,000.

**2. Private Investor Letter**

Second, Nelson challenges the valuation of the letter he wrote to private investors as $2 million in intended benefit for Cifer. The district court found "by a preponderance of the evidence [that] the defendant believed the investor letter would be used to generate at least two [**42] million dollars . . . if not three million dollars . . . and maybe [just] as a starting point."

**HN25**[] The guideline commentary defines the value of "the benefit received or to be received" as "the net value of such benefit." U.S.S.G. § 2C1.1(b)(2)(A), cmt. n.2. The commentary provides two examples:

> (1) A government employee, in return for a $500 bribe, reduces the price of a piece of surplus property offered for sale by the government from $10,000 to $2,000; the value of the benefit received is $8,000. (2) A $150,000 contract on which $20,000 profit was made was awarded in return for a bribe; the value of the benefit received is $20,000. Do not deduct the value of the bribe itself in computing the value of the benefit received or to be received. In the above examples, therefore, the value of the benefit received would be the same regardless of the value of the bribe.

U.S.S.G. § 2C1.1, cmt. n.2; *see* United States v. Griffin, 324 F.3d 330, 366 (5th Cir. 2003).

Nelson gave Cifer a letter expressing his official support for the Cifer project to Quorum Venture Group, which had been set up by the FBI. The original letter, drafted by undercover agents, suggested the New Roads City Council supported [**43] the contract, but Nelson edited it to state that while New Roads was "committed to working towards a contract" to use Cifer, it was contingent on the approval of the City Council and public input. *Id*. The letter concluded: "Be assured that the appropriate steps will be taken to ensure that the city makes a good faith effort to reach a final agreement with [Cifer] that is both fair and reasonable." *Id*. Nelson told the FBI after the investigation had ended that the letter "was to be used to obtain two to three million dollars in private investment money for the Cifer 5000."

As with the EPA letter, while Nelson may have expected the letter to contribute to Cifer's ability to obtain private investments, the letter itself was not a funding application, nor did it explicitly request any funds. The record indicates that Nelson expected Cifer to use its investment funds to launch a legitimate waste receptacle cleaning business. *See* United States v. Sublett, 124 F.3d 693, 695 (5th Cir. 1997) (**HN26**[] where a defendant "uses fraud to procure a contract but intends to provide the contracted for services," the defendant "should not be characterized as causing as much loss as one who intends to totally [**44] cheat the victim, giving nothing in return.").

In overruling Nelson's objection to the $2 million valuation, the district court found that Nelson "not only knew that there would be large profits generated as a result in part from this letter, but also that . . . the letter was yet one step perhaps in a series of steps of activities, the ultimate goal of which would result in a large sum of money to [Nelson] personally." In making that finding, the district court referenced Nelson's stated concern that Cifer would walk away with millions and leave Nelson with "some chump change." That statement, however, was made in connection with the kickback scheme, *see infra*, and not in connection with

the private investor letter. As noted above, furthermore, we have held that the expectation of receiving a large or "substantial" amount of money is insufficiently specific to base a [*524] calculation of intended loss. Roussel, 705 F.3d at 201 ("'Substantial sums' . . . cannot constitute an estimate of an intended benefit for the purpose of the sentencing guidelines enhancement.").

Because we have concluded that a loss recalculation for the EPA letter is appropriate on remand, and because the district court's [**45] reasoning with regard to the private investor letter relied in part on Nelson's general expectation to generate "a large sum of money," we deem that closer scrutiny is advisable regarding the valuation of the private investor letter.[8]

[8] Because we remand on these issues, we need not address Nelson's argument that the district court erred in calculating the full rather than net benefit from the EPA and private investor letters. We nonetheless note that this argument is inconsistent with our precedent. Nelson asserts that the benefit figures should be reduced by the costs Cifer would incur by moving into New Roads, such as purchasing equipment and hiring employees. **HN27**[] The application note to § 2C1.1 provides that "[t]he value of 'the benefit received or to be received' means the net value of such benefit." U.S.S.G. § 2C1.1 cmt. n.3. We have held that the guidelines' use of the phrase "net value" does not mean "net profits." *United States v. Landers, 68 F.3d 882, 885 (5th Cir. 1995)*. Instead, we have distinguished between direct costs—which are properly deducted from the benefits calculation—and indirect or fixed costs, which are not. *Id. at 885-86*.

As further guidance on remand, we observe [**46] that Nelson also argues the $2 million and $4 million values were "set by the government operatives, arguably as a way of enhancing Mr. Nelson's sentence or encouraging a plea." Nelson did not raise this objection below, and does not expand on it on appeal. We have not "expressly determined whether we have accepted the concept of 'sentencing factor manipulation.'" *United States v. Tremelling, 43 F.3d 148, 151 (5th Cir. 1995)*. We note, nonetheless, that this court considered a similar argument in *United States v. Richardson, 925 F.2d 112, 117-18 (5th Cir. 1991)*. In that case, the defendant claimed that the government brought more money to the table in a money-laundering sting operation in order to raise the eventual sentence. *Id*. This court affirmed the sentence because the defendant had "knowledge and acceptance of the amount of funds involved," since he "demonstrated an affirmative desire to launder the money presented to him" and "urged agents to invest greater sums of money, suggested additional laundering scenarios to enlarge the operation, and initiated calls to expedite the receipt of funds." *Id. at 118*. Here, on plain error review there is sufficient evidence that Nelson demonstrated [**47] an affirmative desire to earn millions from working with Cifer; that Grace, not the government, first suggested the idea of obtaining federal grant money; and that Nelson suggested the kickback scheme himself.

**3. Kickback Scheme**

Finally, Nelson challenges the district court's $250,000 valuation of his expected benefit from the kickback scheme. This valuation was based on Nelson's proposal to help obtain other government contracts for Cifer, in exchange for 10% of Cifer's profits from the resulting contracts. Myles and Nelson agreed that if Nelson helped Cifer obtain a $10-million contract resulting in $2.5 million in profit for Cifer, Nelson would retain $250,000. Nelson argues that basing the calculation on a hypothetical contract is overly speculative because "Myles could have picked any amount" for the hypothetical contract.

We conclude, however, that the record supports the district court's determination that Nelson expected to receive at least $250,000 for his role in the kickback scheme. Nelson stated that his "money goal" for the project was to "stack a few mill." He told Myles, in discussing the scheme, that he did not want Cifer to be bought out, "walk away with $300 million [**48] and leave [Nelson] with some chump change." Although the $250,000 figure was mentioned as part of a hypothetical scenario, as the application notes to the sentencing guidelines caution, **HN28**[] a sentencing court "need only make a reasonable estimate [*525] of the loss." U.S.S.G. § 2B1.1 cmt. n.3(C). With regard to the kickback scheme, the government presented sufficient evidence that Nelson intended to secure benefits for himself of at least that amount, if not significantly more, and $250,000 is thus a reasonable—indeed, generous—estimate of the intended loss amount.[9]

**CONCLUSION**

For the above reasons, we AFFIRM Nelson's conviction,

[9] In this case, the district court's downward departure from the sentencing range "does not render harmless the court's starting from an incorrect sentencing guidelines range." Roussel, 705 F.3d at 202. We "cannot assume," absent evidence in the record, that the district court "would not have granted a variance from the correct range" for reasons similar to those originally contemplated, including Nelson's young family and lack of criminal history. *Id.*; *see also Williams v. United States, 503 U.S. 193, 203, 112 S. Ct. 1112, 117 L. Ed. 2d 341 (1992))*.

VACATE his sentence, and REMAND for resentencing [**49] consistent with the above opinion.

---

**End of Document**